IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES HIGHTOWER II, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:15-CV-00091 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment and Memorandum in Support thereof (Document No. 10), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 13), Defendant's Motion for Summary Judgment (Document No. 11) and Memorandum in Support thereof (Document No. 12) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 14). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] Upon consent of the parties, on April 16, 2015, the case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. (Document No. 8).

## I.  Introduction

Plaintiff, James Hightower II ("Hightower") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). Hightower argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Richard A. Gilbert, committed errors of law when he found that Hightower was not disabled. Hightower argues that he has been disabled since December 19, 2011, due to kidney stones/nephropathy, right foot arthropathy, short gut syndrome, right shoulder arthropathy, gastroesophageal reflux disease ("GERD"), hypertension, urinary and fecal incontinence, and frequent urination. In a function report completed in October 2012, Hightower elaborated on the primary problems that preclude him from working:

> "Standing due to foot pain. Stomach pain from unknown problems at this time. Must use the bathroom every 15 to 20 minutes due to bad kidneys, left is non-function and the right has infection. Cannot reach high due to right shoulder have bone sticking out of the upper shoulder. Can not eat sometimes at all because I cannot swallow." (Tr. 146-153).

Hightower seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding his claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Hightower was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II.  Administrative Proceedings

On May 9, 2012, Hightower filed for benefits claiming that he has been disabled since December 19, 2011, due to kidney stones/nephropathy, right foot arthropathy, short gut syndrome, right shoulder arthropathy, GERD,  hypertension, urinary and fecal incontinence, frequent urination

and constant urinary urgency. (Tr. 273). The Social Security Administration denied his applications at the initial and reconsideration stages.  Hightower requested a hearing before an ALJ.  An attorney represented Hightower at the ALJ hearing on July 18, 2013.  Testifying at the hearing were Hightower, a vocational expert ("VE") Lori McQuade, and medical expert ("ME") Dr. John Anigbogu at the hearing. (Tr. 13-22). On September 18, 2013, the ALJ issued a decision denying the benefits sought. Hightower sought review by the Appeals Council of the ALJ's adverse decision. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. The Appeals Council, on November 11, 2013, found there was no basis for granting the request for review. (Tr. 1). Hightower has timely filed his appeal of the ALJ's decision. Hightower has filed a Motion for Summary Judgment (Document No. 10), to which the Commissioner filed a Response (Document No. 13). Likewise, the Commissioner has filed a Cross Motion for Summary Judgment (Document 11), to which Hightower has filed a Response (Document No. 14). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 503. There is no dispute as to the facts contained therein.

**III.  Standard for Review of Agency Decision**

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  *Id.*   While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C.  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his September 18, 2013, decision, that Hightower was not disabled. In particular, the ALJ determined that Hightower had not engaged in substantial gainful activity since December 19, 2011, (step one); that Hightower's combination of kidney stones/nephropathy, right foot arthropathy, short gut syndrome, right shoulder arthropathy, GERD, and hypertension were severe impairments (step two) but the above impairments either singly or in combination did not meet or equal a listed impairment in Appendix 1 of the regulations (step three). Next, based on the medical records, the testimony of the ME, and the testimony of Hightower, the ALJ found that Hightower had the residual functional capacity ("RFC") to perform light work subject to certain restrictions. Hightower could lift and carry 20 pounds occasionally, lift and carry 10 pounds frequently, sit, stand, and/or walk about six hours in an 8-hour workday with normal breaks. He could not climb ladders, ropes, or scaffolds, and could only occasionally balance,

stoop, kneel, crouch, crawl and reach overhead. Finally, the ALJ found that Hightower is limited to working in environments where he has access to a bathroom. The ALJ found that Hightower could not perform his past relevant work (step four). The ALJ further found that based on Hightower's RFC, his age, education and the testimony of a vocational expert, he could perform work as an office helper, toll collector, and garment sorter and was not disabled within the meaning of the Act (step five).  As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

Hightower's medical care has been provided through various hospitals and doctor's offices including Oak Bend Medical Center with Dr. Patel, Fort Bend Imagining with Dr. Daniel, Quest Diagnostics, and Houston Metro Urology.

The medical records reveal that in 1994, Hightower was crushed in a work related accident when a 1,200 pound piece of equipment fell on him resulting in abdominal and intestinal problems.

(Tr. 269, 352). Since then, he has been diagnosed with and treated for kidney stones/nephropathy[2], right foot arthropathy[3], short gut syndrome[4], right shoulder arthropathy, GERD[5], and hypertension[6].

On May 3, 2012, Hightower went to Dr. Patel for epigastric pain that had been lasting for the past year and a half as well as right shoulder pain and intermittent blood in his stools. (Tr. 261-262). Dr. Patel found mild arthropathy, but gave Hightower no secondary diagnosis as laboratory work ups results came back normal. (Tr. 261-262, 441). On May 18, Hightower returned to Dr. Patel complaining of epigastric and right foot pain. Scan results revealed that his abdomen was non-distended, soft, and non-tender without hepatosplynomegaly[7], rebound, or guarding tenderness. Dr. Patel increased Hightower's Prilosec[8] dosage and referred him to a podiatrist. (Tr. 263-264, 443). Later that month, Hightower had a CT scan of his abdomen and pelvis, which revealed a ureteral

---

[2] Nephropathy means kidney disease or damage. See http://www.webmd.com/diabetes/tc/diabetic-nephropathy-topic-overview.

[3] Arthropathy is a collective term for any disease of the joints. See http://www.spine-health.com/glossary/arthropathy.

[4] Short gut syndrome, also known as short bowel syndrome, is a malabsorption disorder caused by the surgical removal of the small intestine, or rarely due to the complete dysfunction of a large segment of bowel. See http://www.nlm.nih.gov/medlineplus/ency/article/000237.htm.

[5] GERD is a digestive disorder that affects the lower esophageal sphincter, the ring of muscle between the esophagus and stomach. See http://www.webmd.com/heartburn-gerd/guide/reflux-disease-gerd-1.

[6] Hypertension, also known as high blood pressure, is a condition where the long-term force of the blood against the artery walls is high enough that it may eventually cause health problems, such as heart disease. See http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/definition/con-20019580.

[7] Hepatosplenomegaly is the simultaneous enlargement of both the liver and the spleen. See http://www.medicinenet.com/script/main/art.asp?articlekey=3716.

[8] Prilosec (also known as Omeprazole) is a proton pump inhibitor that decreases the amount of acid produced in the stomach. Prilosec is used to treat symptoms of GERD and other conditions caused by excess stomach acid. See http://www.drugs.com/prilosec.html.

stent with severe hypodronephrosis[9] in his left kidney, a cyst on his right kidney, and scattered diverticula[10] within his sigmoid colon without evidence of diverticulitis. (Tr. 266-267). Additionally, an x-ray of his right shoulder revealed chronic right AC joint separation and post-traumatic changes of the distal clavicle. (Tr. 266-267, 279). On May 24, 2012, Hightower went to Dr. Manji, a gastroenterologist, complaining of chest pain and difficulty swallowing with intermittent bright red blood via his rectum. (Tr. 431-432).  On May 30, 2012, Hightower went to Oak Bend Medical Center, where Dr. Patel noted his left kidney was malfunctioning and that there was:

> a[n] 8mm cyst arising from the lower pole of the left kidney. A left ureteral stent is present. There is a 7 x 18 mm calculus surrounding the pigtail portion of the stent in the left renal pelvis [and] some calcifications along the stent. There is a mild prominence of the pelvicalycal system of the right kidney and mild prominence of the right ureter without filling defects. A right parapelvic cyst is present. There are scattered diverticuli within the sigmoid colon. (Tr. 277, 437-440).

He prescribed Theragran OTC[11] to be taken once daily, 20 mg of Prilosec (Omeprazole) to be taken once daily, and 15 mg of Meloxicam[12] to be taken once daily for pain as needed. (Tr. 254, 430).

Hightower's mother, Mary Lane, completed a Function Report Questionnaire for him on June

---

[9] Hydronephrosis is the swelling of the kidney due to a build-up of urine. It happens when urine cannot drain out from the kidney to the bladder from a blockage or obstruction. See https://www.kidney.org/atoz/content/hydronephrosis.

[10] Diverticulosis is the formation of numerous tiny pockets, or diverticula, in the lining of the bowel. Diverticula, which can range from pea-size to much larger, are formed by increased pressure on weakened spots of the intestinal walls by gas, waste, or liquid. It can form while straining during a bowel movement, such as with constipation. See http://www.webmd.com/digestive-disorders/diverticular-disease.

[11] Theragran is a multivitamin used to treat or prevent vitamin deficiency due to poor diet or other certain illnesses. See http://www.webmd.com/drugs/2/drug-59070-4249/theragran-oral/multivitaminsincludesprenatalvitaminsliquid-oral/details.

[12] Meloxicam is a nonsteroidal anti-inflammatory drug used to treat arthritis. It reduces pain, swelling, and stiffness of the joints. See http://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details.

11, 2012, stating that her son has trouble standing due to foot pain, has stomach pain, must use the bathroom every 15-20 minutes due to bad kidneys, and that he has right shoulder problems. (Tr. 146-153). The form indicates that his daily activities include preparing meals, driving, and  minor yard work. Hightower is able to dress himself. He has problems when reaching or moving his right shoulder above his head. (Tr. 147-148).  The Function Report states that Hightower is able to walk half a mile before needing to take a 10-15 minutes break to rest. (Tr. 151).

On June 18, 2012, Hightower was admitted to Oak Bend Medical Center Emergency Room complaining of abdominal pain that waxed and waned, as well as nausea and loss of appetite. (Tr. 280-281). Results of a CT of the abdomen and pelvis revealed a "large calculus encasing the distal left ureteral stent measuring 4 x 2.8 cm, [but was found to be] stable" as well as "proximal left-sided hydronephrosis remains [and] right-sided parapelvis cysts [that were] stable" and "diverticulosis with no evidence of diverticulitis". (Tr. 289).

In July 2012, Hightower went to the Emergency Room at Houston Metro Urology complaining of abdominal pain. His abdomen was soft with tenderness, but no organomegaly and he had normal bowel sounds. An abdominal CT scan was performed and the results were compared to his May CT scan. There were no changes. On July 5, 2012, Hightower underwent a consultative examination performed by Dr. Daniel. (Tr. 271-273). X-rays of the right foot, showed:

> There are mild degenerative changes especially of the interphalangeal joint of the great toe but there is no evidence of acute fracture or dislocation or other pathology. (Tr. 269).

As for Hightower's complaints of urination urgency and incontinence and fecal incontinence, and right foot and shoulder pain (Tr. 271-273), Dr. Daniel wrote:

> [Hightower] has had trouble with his kidneys since 1997. He does state he has trouble with urinary urgency and incontinence and he does have to wear extra undergarments for his condition…he states he had a shunt from the left kidney to the

bladder that had to be placed and then removed and then put back in…he has never required dialysis but he does have occasional hematuria[13] and recurrent kidney infections. He does note that his hematuria and infection come on with heavy lifting.

[Hightower] describes pain on the plantar surface of the right foot. He states he has been diagnosed with neuroma in 2001 [and had] neuroma injected several times and he states he continues to have pain especially with cold and wet weather. He [notes] that if his foot does bump something accidentally that he will also have more pain. His last evaluation by a podiatrist was in 2003. He does not wear a shoe insert and will usually wear shoes that are "too big" so he will have more foot room and less pain.

[Hightower] describes "blockage" of his intestines and also had a "crush injury" to the abdominal and intestinal contents in 1994. He did undergo intestinal resection and does have symptoms now that include fecal incontinence, increased abdominal gas and abdominal pain…He describes both constipation and diarrhea as well as black stools and bloody stools. He has not had upper endoscopy (EGD)  or colonoscopy and did go to the emergency room about two week ago and was diagnosed with esophageal reflux disease after he presented with chest pain.

[Hightower] describes right shoulder pain. He had a fall in 2009 and injured his right shoulder [and] now has a bony prominence over the anterior superior right shoulder and he has pain in the shoulder when he does try to reach. He has seen a doctor for this condition and he was told that the "strap is broken" and he will need surgery but he has not been able to afford any type of surgical procedure. He denies any bone fracture and states the shoulder is stiff with cold and wet weather and he does not wear a sling. He states he is able to lift about 25 pounds total. (Tr. 271-272).

 Hightower had no problems standing from a sitting position and he had a hand grip/strength test score of 4.5/5 on the right and 5/5 on the left. (Tr. 273). His upper extremity strength was intact at 4.5/5 on the right and on the left. His lower extremity strength was 4/5 on the right and on the left. (Tr. 273).

On July 17, 2012, Hightower went to Houston Metro Urology where Dr. Schiffman noted:

[Hightower] had a stent placed 12 years ago that was not removed. He started having trouble with severe pain in [the] last 2 years. He finally went to [the] ER 1 month ago and had a CT scan that reported a left hydrophrotic kidney with stent and bladder stone and renal pelvic stone. There is left flank pain. He has mild discomfort and difficulty urinating. He has frequency every 30 minutes. He has had several episodes

---

[13] Hematuria is a condition where blood is found in urine. See http://www.mayoclinic.org/diseases-conditions/blood-in-urine/basics/causes/con-20032338.

of hematuria. He has wakes 3-4x during the night to urinate. There is a normal urinary stream. (Tr. 332).

On July 25, 2012, Hightower underwent surgery at Houston Metro Urology to remove large stones in his bladder and renal pelvis areas. (Tr. 325). Dr. Schiffman's Operative Report found that Hightower retained double J stents for twelve years and had large stones in his bladder and renal pelvis. He noted:

> [The] large stone in his bladder was over 5 cm and a similarly large stone in his renal pelvis associated with hydronephrosis, and some preservation of renal parenchymal. [Hightower] also had severe periurethral inflammation. As the procedure continued, it was more and more difficult to see as there was quite a bit of haze from the stone evaporation as well as some bleeding from the bladder, and once about half of the stone was fragmented, I deemed it unsafe to proceed with the stone fragmentations…and elected to stop the procedure and come back another day. (Tr. 371-372, 411-412).

On August 20, 2012, Hightower had a follow up procedure with Dr. Schiffman. Dr. Schiffman noted that Hightower was experiencing hematuria on and off, and was voiding frequently. (Tr. 320). On August 28, 2012, Dr. Schiffman finished the previous procedure by "crush[ing] the stone" in the bladder through a cystoscopy and transurethral laser cystolitholapaxy.[14] (Tr. 317-319). On August 29, 2012, Hightower underwent surgery to remove his large bladder stones. In his Operative Report, Dr. Schiffman wrote:

> [Hightower had] a huge stone measuring over 6 cm in the bladder on the [double J] stent and same stone in the left kidney with hydronephrosis. He was brought previously to the operative room where part of the stone was destroyed with a laser, but because of visualization problems, the procedure had to be stopped. I was able to completely evaporate and break up the stone and free it from the stent. When this was completed, several larger fragments were individually fragmented as well, and the Ellik evacuator was used to remove most of the stone fragments. It is my intention now that the bladder stones have been completely destroyed to pay attention to the kidney with a differential renal scan to identify whether the kidney has function

---

[14] Cystolitholapaxy is a procedure to break up bladder stones into smaller pieces and remove them. See http://oregon.providence.org/our-services/c/cystolitholapaxy/.

or not, and if it does, a percutaneous nephrolithotomy[15] will be done to treat the stone in the renal pelvis and eventually get rid of the stent. (Tr. 364-365, 423-433).

On September 5, 2012, Hightower went to Houston Metro Urology for a follow up appointment and plan of treatment for his kidney stones. (Tr. 312). There, Dr. Schiffman noted that he was doing well with only some pain in his left flank as he passed fragments of the stone, and there were no signs of hematuria. (Tr. 312).

On September 11, 2012, Hightower was admitted to Oak Bend Medical Center Emergency Room complaining of kidney pain. Dr. Schiffman explained:

> There is decreased flow to the left kidney with delayed time to peak. There is persistent retention of contrast in the left proximal collecting system with delayed washout following Lasix administration. T1/2f of the left kidney is 24 minutes. Differential function in 37.5%. There is normal flow, uptake and excretion in the right kidney with normal excretion there is a solitary focal area of increased uptake on the excretion phase suggestive of a calyceal diverticulum. T1/2 on the right is 10 minutes. Differential function in 62.5%. [The] findings are consistent with obstructive hydrophrosis of the left kidney with delayed and decreased function. (Tr. 292).

On September 12, 2012, an x-ray of his abdomen showed calcification on his right kidney. (Tr. 359-360). Dr. Schiffman prescribed Ketorolac Tromethamine[16], Toradol and Vicodin[17] for pain. (Tr. 308). On September 18, 2012, Hightower went to Dr. Lanza for a gastroenterology consultation.

---

[15] Percutaneous nephrolithotomy (PCNL) is a surgical procedure to remove stones from the kidney by a small puncture wound through the skin. It is most suitable to remove stones of more than 2 cm in size and which are present near the pelvic area. See http://www.webmd.com/kidney-stones/percutaneous-nephrolithotomy-or-nephrolithotripsy-for-kidney-stones.

[16] Ketorolac Tromethamine (also known as Toradol) is used for the short-term treatment of moderate to severe pain. It is usually used before or after medical procedures or after surgery. See http://www.webmd.com/drugs/2/drug-3919/ketorolac-oral/details.

[17] Vicodin is a combination of medications used to relieve moderate to severe pain. It contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen). See http://www.webmd.com/drugs/2/drug-3459/vicodin-oral/details.

Hightower reported he recently passed a large amount of bright red blood and several clots in his urine and stools. He complained of lower abdominal pain and heartburn. Dr. Lanza noted:

> [Hightower] has noted rectal bleeding for several years, but it has become much worse. About a week ago, he passed a large amount of bright red blood and several clots. His bowels move one to three times a day and are normal in shape, size, and appearance when he is not having rectal bleeding. The bleeding is intermittent and sometimes he will go two to three days without any. He has no perianal pain when he has bowel movements, but does have low abdominal pain. He has a lot of heartburn. He was in the hospital two months ago and had an upper GI endoscopy by Dr. Patel and was told he had gastroesophageal reflux. The patient smokes, but less than a pack a day and drinks about two six packs of beer daily. (Tr. 352-354).

Per Dr. Lanza's suggestion, on September 26, 2012, Hightower had a colonoscopy that revealed severe diverticulosis, which could represent nonspecific colitis or a diverticular disease. (Tr. 343). Based on the colonoscopy results, Dr. Lanza wrote:

> [The] rectum…appeared normal…there was no evidence of any perianal disease, specifically no significant hemorrhoids were noted, although the patient did have some external hemorrhoids noted prior to the introduction of the instrument. Patient does have pan diverticulosis. There is no active bleeding at this time. There is no evidence of any neoplastic disease and no vascular lesions were noted except the submucosal hemorrhages previously cited. (Tr. 343-344).

On September 28, 2012, Dr. Schiffman suggested Hightower undergo surgical removal of the remaining stones. (Tr. 304, 476). During a telephone conversation on October 2, 2012, Dr. Schiffman told Hightower that, "he has severe diverticulosis and a type of bleeding [ ] describe[d] as a significant amount of hematochezia[18] over a one-day period with some minimal bright red rectal bleeding afterwards, [which] is consistent with that diagnosis" and that "from [a] gastrointestinal standpoint, [ ] he probably can go ahead and have his renal stones removed." (Tr. 346).

On October 15, 2012, Hightower underwent an evaluation by Dr. Carmenatas for his right

---

[18] Hematochezia is bright red blood in the stool, usually from the lower gastrointestinal tract – the colon or rectum – or from hemorrhoids. See http://www.medicinenet.com/script/main/art.asp?articlekey=18453.

shoulder problems. Dr. Carmenates prescribed pain medication. Dr. Carmenatas noted that there were no fractures or dislocations on Hightower's right shoulder, but there was AC joint arthrosis that was likely caused by chronic posttraumatic injuries. (Tr. 449). On October 31, 2012, Dr. Schiffman noted there was no leakage and minimal erythema notes and encouraged Hightower to begin mild to moderate activity, which included walking but no running or heavy lifting. (Tr. 467).

Hightower was seen again by Dr. Carmenates on November 1, 2012. He complained of chest pain, shoulder pain, renal calculus, and acute sinusitis. (Tr. 501). Dr. Carmenates ordered an EKG for the chest pain, prescribed hydrocodone and ketorolac for the shoulder pain, and Mucinex[19] for the acute sinusitis.

On November 1, 2012, Hightower consulted with Dr. Lamarra, a podiatrist, for his continued foot pain. On November 7, 2012, Hightower went in for a follow up consultation for post-nephrostomy[20] of his left kidney. The doctors found that he was doing well and was medically released to begin "mild to moderate activity" including walking, but not running or heavy lifting.

On December 6, 2012, Dr. Lamarra suggested that Hightower wear an orthotic device.  (Tr. 500). Hightower's right foot pain continued and, in January 2013, EMG[21] results revealed that Hightower suffered from tarsal tunnel syndrome. Dr. Lamarra recommended tarsal tunnel surgery, but Hightower chose more conservative treatment measures, including medication and injections to

---

[19] Mucinex is used to relieve the symptoms of cough and mucus in the chest due to colds, flu, or hay fever. It works by thinning mucus in the lungs and making it less stick and easier to cough up. See http://www.drugs.com/mucinex.html.

[20] Nephrostomy is a procedure of draining the kidney to relieve obstructions. See http://emedicine.medscape.com/article/445893-overview

[21] Electromyography (EMG) is an electro-diagnostic medicine technique for evaluating and recording the electrical activity produced by skeletal muscles. See http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014183.

the right tarsal tunnel region. During a follow up visit with Dr. Lamarra on January 14, 2013, Hightower's strength and grip were tested, scoring 4/5 on strength capabilities. High tower had positive tunnel signs along his anterior ankle that was consistent with possible anterior tarsal tunnel syndrome.

On January 15, 2013 Hightower saw Dr. Schiffman. He complained of frequent urination. According to the treatment note, Hightower reported that he urinates every hour but always has urgency. (Tr. 463). Dr. Schiffman recommended that Hightower avoid dairy products and will undergo a prostate-specific antigen test at his next visit.  (Tr. 463, 496).

Hightower was seen again by Dr. Lamarra on January 22, 2013. Dr. Lamarra opined that Hightower had tarsal tunnel syndrome, internal derangement, and status post calcaneal fracture in his right foot. (Tr. 495). At Hightower's follow up on January 31, 2013, Dr. Lamarra prescribed a cool therapy unit to be used 24 hours a day for pain. (Tr. 491-494).

In February and March of 2013, Dr. Lamarra noted that Hightower continued to have neuropathic pain and tendonitis along his extensor and flexor tendons of his right foot. He prescribed a cane for ambulation and orthotic devices for his right and left feet. (Tr. 489-490). Hightower had a follow up appointment with Dr. Lamarra in May 2013 to adjust supportive devices. (Tr. 489). On June 11, 2013, Hightower complained of right foot and ankle pain. Dr. Lamarra noted ankle joint instability. Dr. Lamarra prescribed a customized brace for Hightower's right ankle and foot. (Tr. 488).

Hightower argues substantial evidence does not support the ALJ's determination about the severity of his impairments and that the ALJ improperly considered Hightower's daily living activities to support his finding of non-disability. He further argues that the ALJ failed to incorporate all of his medically determinable impairments in assessing his residual function capacity ("RFC").

Here, substantial evidence supports the ALJ's finding that Hightower's listed impairments were severe impairments at step two, and that such impairments, individually or in combination, did not meet or equal a listed impairment.  Substantial evidence also supports the ALJ's finding that Hightower had the RFC to perform light work with restrictions. The determination of a claimant's RFC is the sole responsibility of the ALJ. *See Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). The regulations provide that the ALJ's formulation of a claimant's RFC should include consideration of any impairment alleged, whether found severe or not by the ALJ. see 20 C.F.R. § 404.1545(a)(2). Hightower argues that the ALJ erred by not considering his right foot and right shoulder arthropathy and the waxing and waning of pain in formulating his RFC. The ALJ did not disregard the evidence cited to by Hightower. His decision shows that it was taken into account in formulating High tower's RFC. (Tr. 15-20). Because these problems were specifically mentioned in the decision, proper consideration was given to them by the ALJ.

As for Hightower's suggestion that the ALJ erred by not considering the impairment of pain and its effects on his ability to work, there is nothing in the evidence to substantiate that claim. X-rays of Hightower's shoulder and right foot revealed only mild abnormalities. (Tr. 279, 488). In November 2012, Hightower complained of only mild pain and limitation of range of motions and the treatment he received was conservative in nature. (Tr. 247-264, 458-461, 488-501). Finally, as previously stated, the ALJ found greater limitations to Hightower's RFC than the ME and limited him to a reduced range of light work to account for his non-exertional limitations, thus the ALJ did account for Hightower's pain limitations that were corroborated by the medical evidence of record. (Tr. 20).

Additionally, Hightower complains of kidney and bladder complications that were not taken into account by the ALJ in formulating his RFC. (Tr. 140). He points to multiple surgical procedures

to remove stones from both his kidney and bladder (Tr. 271-273, 292, 304, 458-461, 467-468).  The ALJ's decision undermines this claim.  The ALJ limited Hightower to a work environment where he had access to a bathroom.

In conclusion, the ALJ, based on the totality of the evidence, concluded that Hightower could perform a restricted range of light work, and gave specific reasons in support of this determination.  This factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Shweiker*, 653 F.2d 997, 10001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion.  *Paul v. Shalala, 29* F.3d 208, 211 (5th Cir. 1990).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) cert denied, 514 U.S. 1120 (1995); *Oldham v. Schweiker,* 660 F.2d 1078, 1084 (5th Cir. 1981).  Further, regardless of the opinions, diagnoses, and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan,* 919 F.2d 901, 905 (5th Cir. 1990)).

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)  the physician's length of treatment of the claimant,
(2)  the physician's frequency of examination,
(3)  the nature and extent of the treatment relationship,
(4)  the support of the physician's opinion afforded by the medical evidence of record,
(5)  the consistency of the opinion with the record as a whole, and
(6)  the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996). With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d). *Newton,* 209 F.2d at 456. "The ALJ's decision must stand or fall with the reasons set

forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Hightower also argues that the ALJ violated SSR 96-6p in not obtaining an appropriately trained medical expert concerning his specific medical issues. Hightower contends that because the ME was neither a gastrointestinal specialist nor an urologist, he was not medically trained to make determinations on Hightower's medical conditions. It is the ALJ's discretion whether to call a medical expert. 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii). Here, the ALJ called an internist, John C. Anigbogu, M.D. (Tr. 30, 37-40), to testify at the hearing. Dr. Anigbogu testified that Hightower did not meet or equal a listed impairment and that he was capable of a full range of light work. As an internist, Dr. Anigbogu was qualified to speak on Hightower's variety of issues including gastrointestinal and urology. The Fifth Circuit has established that an ALJ is entitled to determine the credibility of the examining physicians and medical experts and weigh their opinions accordingly. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Additionally, in order for the Court to reverse an ALJ's decision for failure to fully and fairly develop the record, Hightower must demonstrate that he could and would have adduced evidence that might have altered the result. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). Hightower has not done so.

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

With respect to the ALJ's consideration of the opinion evidence, he wrote:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The claimant asserts that he has disabling pain involving the right shoulder and right lower extremity. The records, however, do not support the alleged severity of symptoms and limitations. X-ray of the right shoulder performed in May 2012 revealed chronic right AC joint separation and post-traumatic changes of the distal clavicle (Exhibit 7F/4) and x-ray of the right foot only showed mild arthropathy (Exhibit 5F). In November 2012, he complained of only mild pain and limitation of range of motion and treatment received for the alleged disabling impairments has been essentially routine and/or conservative in nature (Exhibits 2F, 12F, and 15F). Surgery for the right lower extremity by way of tarsal tunnel release has been recommended, but he elected conservative treatment measures, including medications and injections to the right tarsal tunnel region (Exhibit 15F/6-8). The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual and his allegation of having debilitating pain is inconsistent with objective musculoskeletal examination findings in July 2012. He did not have evidence of muscle atrophy or bone enlargement, crepitus, bony or tissue destructions, or joint instability, redness, swelling, or effusion and neurological examination was normal. He had 4.5/5 strength in both upper and lower extremities and handgrip strength was 4.5/5 in the right and 5/5 in the left (Exhibit 5F).

The claimant asserts that he is disabled due to complications related to kidney and bladder problems. He underwent surgical procedures to remove a stone in his bladder with no post-operative complications. He has 37% functioning of his left kidney and normal findings on the right kidney. He takes medication for the kidney stone and he has done well with appropriate treatment. He does not require dialysis (Exhibit 5F) and in November 2012, he was one-week post nephrostomy of the left kidney (Exhibit 12F/10) and was doing well, denying any pain related to the kidneys.

Previous examinations in October 2012 revealed minimal erythema and no leakage following his nephrostomy. He was doing well and was medically released to being "mild to moderate activity" (Exhibit 14F/5-6). The claimant's kidney and bladder conditions are stable with ongoing treatment and the medical evidence simply does not support his alleged symptomology of debilitating pain and excessive need for bathroom breaks.

The ALJ's decision is a fair summary and characterization of the medical records. The ALJ thoroughly discussed the medical evidence and gave specific, detailed reasons for the weight given to opinions of Dr. Anigbogu, the state agency medical consultants and Hightower's treating physical

therapist. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment, which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment, which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Hightower testified on July 18, 2013, that he has "constant pains through [his] right leg. It was ran over by a forklift in 2000 and hurt my foot and now my whole leg, it's coming up my leg. It's getting higher up and higher up on my right leg." (Tr. 32). He stated that he was only able to stand for about five minutes at a time because the pain is too great, but that he "can sit because I can

tolerate the pain sitting down." (Tr. 33). When asked to describe what the pain feels like, Hightower

replied:

> [I]t's like, especially with the first step, it's like nothing's there, no blood circulation. But, once I start to move the pain starts to kind of ease away but it's consistent. And I can get a pain, like right now, and I have to stop whatever I'm doing. Sometime I have to just stand there until the pain goes away and then I can – sometime it's one minute and sometimes it's three or four minutes. (Tr. 36-37).

He also stated that on a typical day, his pain "runs about a seven" on a scale from one to ten.

(Tr. 37).

Based on the reasons, which follow, the ALJ rejected Hightower's complaints as not fully

credible:

> The records…do not support the alleged severity of symptoms and limitations. [An] x-ray of the right foot only showed mild arthropathy (Exhibit 5F). In November 2012, he complained of only mild pain and limitation of range of motion and treatment received for the alleged disabling impairments has been essentially routine and/or conservative in nature (Exhibit 2F, 12F, and 15F). [H]e elected conservative treatment measures [for his right lower extremity by way of tarsal tunnel release] (Exhibit 15F/6-8). The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual and his allegation of having debilitating pain is inconsistent with objective musculoskeletal examination findings.

>      *     *     *

> He underwent surgical procedures to remove a stone in his bladder with no-post operative complications. He has [] normal findings on the right kidney…and he has done well with appropriate treatment. [H]e was one-week post nephrostomy of the left kidney [and] den[ied] any pain related to the kidneys.

> The claimant's kidney and bladder conditions are stable with ongoing treatment and the medical evidence simply does not support his alleged symptomology of debilitating pain and excessive need for bathroom breaks.

>      *     *     *

> [H]e is independent with all aspects of personal care, watched TV, prepares simple meals, washes dishes, sweeps, vacuums, walks, rides in a car, spends time with others and shops in stores for groceries.

&ast;   &ast;   &ast;

He testified that he can carry 30 pounds with the left arm and in his Function Report dated October 2012, he reported that he could lift about 20 pounds (Exhibit 10E/6).

&ast;   &ast;   &ast;

[N]o treating physician has expressed an opinion regarding the claimant's ability to perform work related functions. (Tr. 19-20).

Credibility determinations are within the province of the ALJ to make. *See Greenspan*, 38 F.3d at 237 ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" (quoting *Scott*, 770 F.2d at 485)).

As for Hightower's argument that the ALJ mischaracterized his testimony concerning his activities of daily living, the ALJ's consideration of activities of daily living is a part of the credibility determination. *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating that an ALJ is to consider activities of daily living as part of a credibility evaluation). The ALJ made and supported his credibility determination with references to the objective medical evidence, two function reports, and Hightower's testimony about his daily activities. Therefore, the undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Lorie McQuade, a vocational expert ("VE"), at the July 18, 2013 hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a VE's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments, which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

ALJ: Assume a hypothetical individual of the claimant's age and educational background with the ability to perform the exertional demands of light work as defined in the Commission's Regulations. Specifically, the individual can occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; the individual can stand and walk about six hours out of an eight hour workday with normal breaks; sit for about six hours out of an eight hour workday with normal breaks; the individual can occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance; occasionally stoop; occasionally kneel; occasionally crouch; occasionally crawl. Further assume that the individual is limited to occasional overhead reaching; and limited to a work environment where there's access to a bathroom. Would that individual be able to perform any of the claimant's past work?

VE: No.

ALJ: Would there be any other jobs that this individual could perform?

VE: We would have to look at use of transferrable skills or unskilled work administratively recognized by the Commissioner. And examples of those types of

occupations that would be compatible with your hypothetical would include something like an office helper, 239.567-010, existing by 200,000 nationally and approximately 5,000 in the local regionally economy. Something like a toll collector, 211.462-038, approximately 1,000,000 in the national economy and 6,000 in the local regional economy. Or something like a garment sorter, 22.687-014, 800,000 nationally and between 2,000 and 5,000 in the local regional economy.

ALJ: Okay. Let me pose a second hypothetical. The same as the first, however assume that the individual would need two to three unscheduled work breaks lasting 30 minutes in duration. Would that individual be able to perform these jobs?

VE: Would not maintain competitive work, sir.

Hightower argues that because he requires frequent bathroom breaks and unscheduled rest breaks throughout the day, the ALJ erred by failing to include this in his RFC assessment. Here, the ALJ's RFC determination included the limitations supported by the record, i.e. that Hightower needed to be near a bathroom at work. Hightower also asserts that his impairments "wax and wane", and that the ALJ should have made an affirmative finding that he could not maintain employment. There is, however, no evidence in the record that Hightower has an impairment that "waxes and wanes". The ALJ determined, based upon Hightower's RFC and his own testimony, that he could perform a light level of work on a sustained, regular, and continuing basis.

A hypothetical question is sufficient when it incorporates the impairments, which the ALJ has recognized to be supported by the whole record. The ALJ's hypothetical question included the limitations he found supported by the record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Hightower was not disabled. Based on the testimony of the VE and the medical records, substantial evidence supports the ALJ's finding that Hightower could perform work as an office helper, toll collector, or garment sorter because the above described jobs are consistent with his RFC.

The Court concludes that the ALJ's reliance on the VE's testimony was proper, and that the VE's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Hightower was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Hightower was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 10), is DENIED, Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 14th  day of August, 2015

Frances H. Stacy
United States Magistrate Judge